

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 21, 2022

**BY ECF**
Hon. John P. Cronan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *United States v. Andrew*, 22 Cr. 32 (JPC)

Dear Judge Cronan:

Rather than adhere to the principles he purported to instill in the students enrolled in Democracy Prep Public Schools ("DPPS"), the charter schools he founded, Seth Andrew (the "defendant") executed a months-long scheme to steal $218,005 from those who once trusted and relied on him. There should be no mistake that Andrew stole this money to further his own interests. Indeed, he committed this brazen and shameless act to exact revenge on DPPS simply because they declined his request to return as their leader. Once the stolen funds were under his control, over several months, Andrew executed a series of financial transactions to cleanse the funds of their association with DPPS and deposited the money into his fledgling non-profit Democracy Builders. DPPS has correctly described Andrew's crime as a "profound betrayal" of its mission to educate "responsible and caring citizens." (Ex. A (Statement of Democracy Prep Public Schools).)

Although Andrew has plead guilty, instead of fully accepting the wrongness of his actions he has chosen to "not dwell on th[e] details" of his conduct. (1/14/22, Tr. (Ex. C) at 35.) Indeed, his sentencing submission attempts to outline "factors" that caused his crime. Andrew contends his motivations were complicated by frustrations with DPPS and goes so far as to suggest that his actions were justified by a desire to "manage[ ] [the stolen funds] appropriately, and help the same students and alumni that Democracy Prep had always served." (Def. Subm., at 20.) Setting aside the inappropriate victim-blaming in his submission, the money was not Andrew's to manage. His view that he could simply take it because he was frustrated and angry underscores that a substantial sentence is necessary to ensure that Andrew understands the seriousness of his offense.

Andrew's conduct, his failure to grapple with the harm he imposed, the gravity of his actions, his abuse of trust, and the many steps he took to obfuscate the money he strongly stole counsel in favor of a sentence of incarceration at the lower end of the Stipulated Guidelines Range of 21 to 27 months.

July 21, 2022
Page 2

A. Offense Conduct

a. Background of The Defendant's Relationship with Democracy Prep

Democracy Prep Public Schools is a series of charter schools, based in New York City, that focuses on providing educational opportunities to underserved communities. (*See* PSR ¶ 2.) The defendant founded the first Democracy Prep school in 2005, becoming its superintendent and thereafter the *de facto* leader over all of DPPS. In October 2012, the defendant announced he was leaving Democracy Prep to begin work promoting another non-profit, Democracy Builders. (PSR ¶ 13.) At that time, Democracy Builders was a sister organization of Democracy Prep. But, the following year, on October 31, 2014, Democracy Builders and Democracy Prep split into two separate entities. (PSR ¶ 16.) The defendant signed the separation paperwork on behalf of Democracy Builders.

Also in 2014, the defendant began working for the United States Department of Education. From that role, he transitioned to work as a senior advisor in the Office of Science and Technology Policy at the White House until November 2016. (PSR ¶ 17.) While working in the White House, Democracy Prep paid the defendant's salary via an Intergovernmental Personnel Act Agreement. (*Id*.)

The formal relationship between the defendant and Democracy Prep officially ceased on in January 2017. Andrew's severance package included a $100,000 payment and COBRA health coverage until June 2017. The defendant's Democracy Prep email account was left active only so that Andrew could have any emails sent to him at that address forwarded to his Democracy Builders account. (PSR ¶ 20.)

b. The Escrow Accounts

The New York State Board of Regents requires charter schools to maintain an escrow account of at least approximately $75,000 that can be accessed only for certain reasons, such as to cover expenses should the school ever dissolve. (PSR ¶ 22.) Failure to maintain an escrow account could threaten a charter school's status as a school authorized by the NY Board of Regents. Indeed, as the agreement between a Democracy Prep charter school and NY Board of Regents made clear, failure to maintain the escrow account is considered a "material" violation of the charter agreement. (PSR ¶ 22.) Having been the signatory of that charter school's Board of Regents agreement, the defendant was aware of the importance of the escrow accounts. (*See id.*)

On March 5, 2009, March 8, 2011, and March 26, 2013, Democracy Prep opened escrow accounts for "Democracy Preparatory Charter School," "Democracy Preparatory Harlem Charter School," and "Democracy Preparatory Endurance Charter School," respectively. (*See* PSR ¶¶ 22 – 26.) The defendant was identified in the opening paperwork for each of those three accounts. (*Id*.) The funding for the escrow accounts was provided by the public—specifically, the New York

July 21, 2022
Page 3

City Department of Education.  (PSR ¶ 27.)[1]  As explained above, these accounts were established pursuant to the Board of Regents charter school requirements.  They were essential to ensure each of the schools fulfilled their charter agreement obligations and, according to Democracy Prep former executives, were "not to be touched at all."  (PSR ¶ 27.)

### c. *Andrew Steals Democracy Prep's Money*

Under the leadership of former executives, in late 2018 and early 2019, Democracy Prep faced certain financial challenges.  During this time, Andrew maintained contact with Democracy Prep's then-CEO and opined how the issues should be resolved.  In early 2019, the then-CEO was replaced. Apparently frustrated with decisions made by Democracy Prep, and his inability to exercise control over the organization, Andrew sought to rejoin DPPS.  His desire to rejoin the organization came to a head on March 10, 2019.  That day, Andrew sent an email to several members of the Democracy Prep Board, including its Chairman, with whom Andrew had a decade-long professional relationship:

> Here is my immediate proposal to help get DPPS and DPNY out of its current financial, talent, and operational situation. Please reply with your answer within 24 hours of this email to demonstrate that the DPPS board shares this urgency.
>
> I would sign a DPPS staff employment contract immediately, effective March 11th, 2019 through June 30, 2019 as "President" for DPPS and/or DPNY. . . .  I would be paid $25k/month as salaried employee and basic frugal expenses would be covered. (Note, I will not consider being a consultant under any circumstances) . . . . I'll sign an NDA and non-solicit. If I succeed in ALL the deliverables below I'll get a $250k bonus in July, 2020.

(Ex. B.)

The March 10, 2019 email next outlined the jobs the defendant would perform, as well as who would report to him.  It also listed his deliverables.  The email closed with the following:

> [Board Member], these are my terms as of today. But every single day that goes by, this situation becomes exponentially more difficult and the ability to pull out of a nosedive becomes harder. So after 24 hours, my monthly salary expectation will go up every day that we're not under a signed contract.

---

[1] According to a Democracy Prep Board Member, the defendant was philosophically opposed to funding any Democracy Prep schools with anything other than Government funding. (PSR ¶ 27.)

July 21, 2022
Page 4

> I'm hopeful we can work this out today.  If we can't, I'll still be
> rooting for you, but I probably won't be working for you.
>
> Seth

(*Id.*)

DPPS rejected Andrew's offer.

Eighteen days after Andrew sent the March 10, 2019 email, he walked into a particular bank ("Bank-1") in Manhattan, and, without authorization from anyone, closed two of Democracy Prep's escrow accounts.  (PSR ¶¶ 28 – 29.)  Andrew was able to do this because he was named on the escrow accounts paperwork as an authorized signatory for the accounts, as a result of his earlier work with the schools.  The bank provided him two checks representing the liquidated escrow accounts—one made out to "Democracy Preparatory Charter School" in the amount of $71,870.60 and a second check made out to "Democracy Preparatory Harlem Charter" in the amount of $70,642.98.  (*Id.*)

The same day that he closed those two escrow accounts, Andrew traveled to a different bank ("Bank-2") in Manhattan and opened a bank account in the name of "Democracy Preparatory Charter School" ("Fraud Account-1") and associated that account with the address of Democracy Builders.  (PSR ¶¶ 30-31.)  To falsely demonstrate to Bank-2 that Andrew was an executive of "Democracy Preparatory Charter School," Andrew forwarded an email from his Democracy Prep email account to a Bank-2 employee ("Employee-1"), who opened the account for him.  That email contained Democracy Preparatory Charter School bylaws, certificate of incorporation, registration statement and a document from the IRS.  (PSR ¶ 33.)  The provision of those materials satisfied Employee-1 that Andrew was, as he had claimed, the "Key Executive with Control of the Entity," namely "Democracy Preparatory Charter School."  (PSR ¶¶ 31, 34.)  Andrew deposited into Fraud Account-1 the check for $71,870.60 made out to Democracy Prep Charter School.  The defendant did not deposit the second check he obtained earlier that day, which was in the name of "Democracy Preparatory Harlem Charter."

On April 2, 2019, using an ATM machine in Baltimore, Andrew deposited into Fraud Account-1, the check made out to "Democracy Preparatory Harlem Charter," in the amount of $70,642.98.  In an interview with the Government, Employee-1 stated, in substance and in part, that he did not know how Andrew was able to deposit that check into Fraud Account-1 given that the check was made out to an entity different than the name on the bank account. Clearly Andrew was aware that had he attempted to deposit this check at the branch, when he opened Fraud Account-1, it would have raised questions.  So, Andrew waited until he could use an ATM to make the deposit.

Approximately six months later, on October 17, 2019, Andrew returned to a Bank-1 branch and, without receiving authorization from anyone, closed out a third Democracy Prep escrow account.  (PSR ¶ 38.)  Again, Andrew was able to do this because he was named as a signatory in the account's opening documentation.  Upon closing the account, Bank-1 provided the defendant

July 21, 2022
Page 5

a check made out to "Democracy Preparatory Endurance" in the amount of $75,481.10.   (PSR ¶ 38.)  Bank-1 surveillance footage captured Andrew closing the account at the teller's desk.

On October 21, 2019, the defendant opened a bank account at a different bank ("Bank-3") in the name of "Democracy Builders Fund Inc." ("Fraud Account-2")—the non-profit entity under his control.  (PSR ¶ 39.)  That same day, Andrew deposited into the "Democracy Builders Fund Inc." account the $75,481.10 check representing the stolen escrow funds from "Democracy Preparatory Endurance." (*Id.*)

On November 19, 2019, the defendant closed the account he opened at Bank-2 and obtained a check in the amount of $144,473.29 made out to Democracy Prep Charter School, which represented the stolen escrow funds from the first two Democracy Prep schools.  (PSR ¶ 40.)  Andrew attempted to deposit that check into Fraud Account-2 but was unable to do so because Fraud Account-2 was in the name of Democracy Builders Fund.  To solve this problem, Andrew returned to Bank-2 and obtained a new check, which was made payable to "Democracy Builders Fund Inc." (*Id.*)  On November 19, 2019, the defendant successfully deposited this new check into Fraud Account-2.

The next day, Andrew transferred the proceeds from the "Democracy Builders Fund Inc." account—approximately $210,000—into a CD held by Bank-3.  That CD matured on May 20, 2020 and earned an additional $2,083.52 in interest.  That same day, May 20, 2020, Andrew transferred the proceeds of the matured CD—*i.e.* the proceeds of the stolen escrow funds—to a Democracy Builders operating account.  On May 21, 2020, the Democracy Builders operating account sent a $225,000 wire which was a deposit toward property Democracy Builders purchased in Vermont.[2]  Though the operating account had sufficient assets to otherwise cover the $225,000 deposit, including proceeds from a PPP loan, the Government believes the timing of the transfers indicates the stolen funds were used by Andrew to fund this down payment.

d.  *As a Collateral Benefit, Andrew Used Democracy Prep's Money to Secure a Deduction on His Mortgage Interest Rate*

On August 21, 2019, Andrew and his spouse closed their purchase of a three-bedroom apartment on Central Park West for approximately $2.3 million.  (PSR ¶ 43.)  The apartment featured views of Central Park.  To purchase the apartment, Andrew and his wife obtained a $1,776,000 mortgage from Bank-2.

In March 2019, when Andrew stole two of Democracy Prep's escrow accounts, Bank-2 ran a promotion that, for every $250,000 held at Bank-2, up to a total of $1,000,000, Bank-2 would lower a qualifying customer's mortgage interest rate by 0.125%. (PSR ¶ 44.)  Employee-1 recalled that when Andrew opened Fraud Account-1, he claimed that he wanted to clean up his multiple

_____

[2] *See* VermontBiz, "Marlboro College to sell campus to Democracy Builders," available at https://vermontbiz.com/news/2020/may/28/marlboro-college-sell-campus-democracy-builders, last accessed July 20, 2022.  Due to financial problems at Democracy Builders the property was subsequently sold.

July 21, 2022
Page 6

bank accounts to make things easier for himself.  In an interview with the Government, Employee-1 had a distinct recollection of the defendant, who he recalled was a "DC Politico," referred to him by a Bank-2 mortgage banker ("Employee-2") so that the defendant could get a discount on a mortgage rate.  (*See* PSR ¶ 46.)  Employee-2, Andrew's mortgage banker, informed the Government that although he does not have a specific recollection of discussing the promotional mortgage program with Andrew, he generally shared that information with every potential customer.  Documents from Bank-2 demonstrate that the stolen funds were necessary for Andrew to exceed the $1,000,000 threshold on April 8, 2019, which was shortly after Andrew paid the deposit on his Central Park West Apartment.  Employee-2 explained the 2.5% interest rate Andrew obtained was a result of a 3.25% base rate, which was lowered to 3% due to market movements and lowered again to 2.5% because Andrew qualified for the promotion—he maintained at least $1,000,000 in Bank-2.[3]

The Government calculates the additional mortgage interest rate promotion would have saved Andrew approximately $20,453.95 over the course of the first ten years of his mortgage.

After obtaining a mortgage from Bank-2, Andrew exited his relationship with Bank-2. Employee-1 recalled that Andrew falsely accused him of a "bait and switch" because Andrew wanted his new Bank-2 accounts to qualify for another separate promotional interest rate on business checking accounts he opened including accounts for Andrew's other businesses. Employee-1 has stated that Andrew was not eligible for this promotion and estimated the promotion would have netted Andrew only a couple hundred dollars in savings.  Employee-1 believed it was possible the defendant intentionally acted on this promotional interest rate dispute so he could have a good reason to close his accounts after obtaining his mortgage, as other customers had done in the past.

B.  Procedural History and Guilty Plea

Andrew was arrested on April 27, 2021, pursuant to a Complaint, which charged him with wire fraud, money laundering, and making false statements to a bank.  On January 14, 2022,

---

[3] After the Final PSR was issued, defense counsel described to the Government an email dated April 10, 2019, in which Andrew contacted Employee-2 seeking confirmation that his IRA was transferred to Bank-2 so that he could take advantage of the "lowest possible [mortgage interest] rate."  Employee-2 responded he was attempting to obtain an exception to qualify the "nonprofit assets" (potentially the stolen DPPS funds) for the discount rate.  The defense also highlighted a document which demonstrates that on April 18, 2019, Andrew transferred an additional $141,725 to Bank-2 by transitioning his IRA to Bank-2.  Thus, under the defense's view, this transfer means that even without the stolen funds Andrew would have received the full mortgage interest rate deduction.  That may be true.  But, nonetheless, even under the defense's telling, it appears Andrew at least sought to use the stolen money to achieve the full mortgage interest savings.  Further, other documents from Bank-2 demonstrate that the stolen funds were necessary for Andrew to exceed the $1,000,000 threshold on April 8, 2019.  In any event, Andrew did not steal DPPS's money simply to lower his interest rate.  That was a collateral benefit.

July 21, 2022
Page 7

Andrew waived his right to an indictment and plead guilty to one count of wire fraud. Andrew entered that plea without the benefit of reviewing discovery.

Pursuant to a plea agreement, the defendant stipulated that the base offense level was seven, which is increased by 10 levels because the intended loss amount was more than $150,000 but less than $250,000. The offense level is further increased by two levels pursuant to U.S.S.G. § 2B1.1(b)(9)(A) because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency.[4] After accounting for acceptance of responsibility, the total offense level is 16. Andrew has zero criminal history points. Therefore, the Stipulated Guidelines Range is 21 to 27 months' imprisonment.

During the plea proceeding, the defendant allocuted that he ended his employment with Democracy Prep in January 2017. Then the defendant stated "[i]n March, April, and October of 2019, I transferred funds from three dissolution accounts associated with the Democracy Prep network to other bank accounts that I opened. I ultimately transferred those funds into the account of another nonprofit, Democracy Builders Fund. I transferred the funds to the Democracy Builders Fund without the written authorization of DPPS . . . . I represented to bank employees that I was authorized to transfer these funds."[5] (Tr. at 33 (Ex. C).) The defendant then apologized for what he did and the "impact that it has had on the schools, the alumni, and my own family." (*Id.*) The Court then inquired of the defendant whether, when he deposited the dissolution funds "was it your intention to deceive?" (*Id.* at 34.) Andrew did not directly answer the Court's questions and instead stated "I represented to bank officials that I had authorization, and I chose not to dwell on that. And I did so without written authorization from DPPS." (*Id.*)

The following colloquy occurred:

> THE COURT: When you represented to bank officials that you had authorization, did you know that you did not, in fact, have authorization?

---

[4] Under the facts present here the two-point enhancement for abuse of position of trust or use of special skill pursuant to U.S.S.G. § 3B1.3 would appear applicable. However, the Guidelines are clear that where "the conduct that forms the basis for an enhancement under subsection (b)(9)(A) [misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization] is the only conduct that forms the basis for an adjustment under §3B1.3 (Abuse of Position of Trust or Use of Special Skill), do not apply that adjustment under §3B1.3." U.S.S.G. § 2B1.1 cmt. 8(E).

[5] Given his allocution Andrew appears to have known, and obviously did know, that Democracy Prep was the victim of his conduct. However, earlier during his Court appearance, when the Court and the Government identified Democracy Prep in an anonymized fashion as the "victim" regarding Andrew's restitution obligations, Andrew remarked "[w]hen we're referring to the victim, who are we speaking of?" (Tr. at 25.)

July 21, 2022
Page 8

> THE DEFENDANT: I think -- I knew I did not have written authorization from DPPS.
> THE COURT: You say "written authorization." Did you think you had any other type of authorization?
> THE DEFENDANT: I did so without authorization from the DPPS leadership at that time.
> THE COURT: Mr. Finkel, are there additional questions you'd like me to ask -- maybe before I ask you that, you said without the authorization of the – I'm sorry, is it DP --
> THE DEFENDANT: DPPS leadership.
> THE COURT: At the time, was it your understanding that anyone other than leadership of DPPS could give you authorization?
> THE DEFENDANT: Can you ask the question again, your Honor?
> THE COURT: Sure. I believe what you said was that you did so without authorization from DPPS leadership, so I wanted to ask about the word "leadership" there. At the time, were you under the impression that anyone other than leadership of DPPS could give you the necessary authorization?
> THE DEFENDANT: At the time, I did not dwell on those details, your Honor.
> THE COURT: What do you mean by that?
> MR. KIM: Your Honor, may we have one moment?
> THE COURT: Of course.
> (Pause)
> THE DEFENDANT: Your Honor, can I clarify? I'm sorry, I did not have authorization from DPPS.
> . . . .
> [THE COURT:] When, Mr. Andrew, you represented that you had authorization to bank officials to transfer the funds, did you know that you did not, in fact, have that authorization?
> THE DEFENDANT: Correct, your Honor.

(*Id.* 34 – 36.)

After pleading guilty, the defendant satisfied his restitution obligation to Democracy Prep in the amount of $218,005 and satisfied his forfeiture obligation to the Government in the amount of $22,537.47. [6]

    C.  Presentence Investigation Report and Victim Impact Statement

In the PSR, consistent with the parties' plea agreement, the Probation Department calculated a total offense level of 16 and zero criminal history points. (PSR ¶ 69.) Recognizing

---

[6] The $22,537.47 represents the Government's calculation of the amount Andrew saved on his mortgage and the interest he earned from the CD which held the stolen escrow funds.

that the Guidelines are 21-27 months, Probation recommends a sentence of 366 days. (PSR at 36.) Probation considered "the defendant's non-violent offender status, his positive adjustment to pretrial services, his mental health ailments, and his family responsibilities." (PSR at 38.)[7] Nonetheless, Probation concluded that it "cannot overlook the greed and brazenness of this offense. Andrew stole money from the very same schools he helped create." (*Id.*) Accordingly, Probation concluded that "a term of imprisonment is warranted." (*Id.*)

The Final PSR was issued before DPPS provided its victim impact statement. (*See* Ex. A.) In addition, the Government received two emails from individuals associated with the Marlboro Community, which is the site where Andrew purchased property for Democracy Builders. (*See* Ex. E.) The Government does not contend these individuals are victims but has appended their statements in an exhibit, to the extent the Court believes they are relevant to its consideration of the applicable § 3553(a) factors.

### D.  Sentencing Factors

#### a.  *Applicable Law*

As the Court is aware, the Guidelines still provide strong and relevant guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the

---

[7] Andrew's "mental health ailments" are ███████████████████ ████████████████████████████████████████████████ (PSR at 37.) To the extent these mental health issues impact Andrew, they did not preclude him from creating, and operating, a successful network of charter schools or from working in the White House. The Government does not believe these diagnoses are a mitigating factor that excuses any of Andrew's conduct.

July 21, 2022
Page 10

need to avoid unwarranted sentence disparities among defendants with similar records who engaged in similar conduct"; and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)     to afford adequate deterrence to criminal conduct;

> (C)     to protect the public from further crimes of the defendant; and

> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).   To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

### b.  Discussion

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct to those similarly situated.   Under the circumstances, the Government believes that a sentence of incarceration at the lower end of the Stipulated Guidelines Range is appropriate.

### 1.   The Defendant's Crime was Serious

Andrew egregiously abused the trust placed in him by Democracy Prep, its students, its staff, and its community.  Andrew's theft of $218,000 is itself a serious action that represents significant quantitative harm to a non-profit dedicated to educating underprivileged children.  But what cannot be measured in dollars is what Democracy Prep describes as, Andrew's "profound betrayal." (Ex. A.)  Andrew was more than just a teacher at the school, he was its leader and the one who "wore the yellow hat," admired by both students and staff.  (*See* PSR ¶ 14.)  As an educator, Andrew should know better.  But rather than demonstrate the values he purported to cherish as a leader of youth, Andrew betrayed their trust, stealing $218,000 to hurt Democracy Prep, advance his own personal ambitions, and feed his ego.  (*See* Def. Subm. at 19 ("Ego undoubtedly played a role in Seth's actions").)

July 21, 2022
Page 11

       The seriousness of the criminal offense is apparent because the defendant harmed his target.  He injured Democracy Prep's "good name and reputation," which required "great effort, strong leadership, and the hard work of [its] staff and scholars" to repair. (Ex. A.)

       The harm Andrew inflicted on Democracy Prep was intentional.  The timing of the defendant's actions demonstrates that his motivating factor was revenge.  As described above, Andrew pitched DPPS on a plan to address the problems he believed the schools were suffering. The solution Andrew pitched, naturally, required Democracy Prep to hand the reigns to him, demote its interim CEO and, at the same time, pay Andrew a lavish salary.  The defendant demanded this in an email sent on March 10, 2019.  He was clear that his "terms" expired in 24 hours and "after 24 hours, my monthly salary expectation will go up every day that we're not under a signed contract." (Ex. B.)  Democracy Prep declined Andrew's proposal.  It had moved past Andrew's involvement and desired to chart its own course.  Just over two weeks later, Andrew stole $142,513.58 from two different DPPS escrow accounts.  That is not a coincidence.  Andrew was unhappy that his former school had rebuffed him, so he took its money to hurt the organization and the people who had replaced him at its helm.  Engaging in a fraud scheme to punish a non-profit because it did not want to hire him is patently unacceptable.

       That Andrew's crime was chiefly motivated to cause harm to a non-profit school system is an aggravating factor.  Even worse, the defendant's criminal activity was not confined to a single incident.  He carefully executed a scheme that lasted several months.  It began in March 2019, when he dug up years-old corporate documents saved in his Democracy Prep email account to falsely represent to Bank-2 that he was an executive with control over Democracy Prep when he was not.  Also on March 28, 2019, despite being in possession of two checks, Andrew methodically waited to attempt to deposit the check made out to "Democracy Preparatory Harlem Charter" until he could access an ATM in Baltimore.  Andrew waited because he knew that a check made out to "Democracy Preparatory Harlem Charter" would not be accepted into the account named "Democracy Preparatory Charter School."

       Approximately seven months later, in October 2019, Andrew stole *again*.  He returned to a Bank-1 branch and extracted an escrow account from a *third* Democracy Prep school.  This time Andrew brought the money to Bank-3 and deposited it into an account in the name of his current venture "Democracy Builders Fund."  In that account Andrew combined the escrow funds he stole in March 2019, rolling all the stolen proceeds into a CD.  The day the CD containing the stolen money matured, in May 2020, Andrew transferred the proceeds of the stolen escrow funds to a Democracy Builders operating account.  Because of the multiple steps, over several months, Andrew's criminal activity would have required the defendant to reflect on the wrongness of his conduct and determine whether it should continue.  And at each opportunity, Andrew continued. He continued to steal funds and transfer funds. And ultimately, he used the funds to enrich Democracy Builders.  The series of financial transactions reveals more than just the ongoing nature of Andrew's criminal conduct; it also demonstrates sophistication, in that Andrew took steps to cleanse the stolen money of its association with Democracy Prep.

       Beyond the punitive motivations behind his actions, the defendant also personally gained from his crime.  The stolen money supported Democracy Builders, the organization Andrew

July 21, 2022
Page 12

focused his attention on after leaving the White House.  Indeed, the day after Andrew transferred $212,083.52 of the stolen proceeds from the CD into a Democracy Builders operating account, Andrew sent a wire for $225,000 bearing the reference line "Marlboro Deposit/Bnf/Marlboro College Deposit."  That deposit was a down payment on a significant purchase of property for Democracy Builders.  And, as a collateral benefit, Andrew also sought to rely on the stolen money to ensure he would receive an additional interest rate deduction for his $2 million Central Park West apartment.

Andrew's motive, careful planning of several acts over the course of many months, and personal gain obtained from the criminal conduct all emphasize the seriousness of the offense and the need for the Court to impose a significant sentence of incarceration.

### 2.   Deterrence Counsels in Favor of a Serious Sentence

It is important that those who might choose to abuse positions with which they are entrusted be sent a clear message that such conduct will not be tolerated and will result in appropriate consequences.  The defendant's request for a sentence of home confinement would not adequately vindicate this 3553(a) factor.  Others similarly situated should also understand that theft of $218,000 is an extraordinarily serious action especially where, as is the case here, it involved multiple acts over the course of several months and was motivated by a desire to punish an innocent non-profit organization.  Simply because Andrew's theft was accomplished through email, misrepresentations in documents, and polite conversation, rather than brute force does not remove the severity of the offense and does not render incarceration excessive.  If anything, a con of this sort—targeted, brazen, and lucrative—requires just punishment to dissuade others from similar conduct.

Nor is it clear that Andrew has fully accepted responsibility for his offense.  While he plead guilty pre-indictment, his equivocation during his plea allocution was remarkable.  His instance of telling this Court, twice, that he "did not dwell on th[e] details" of the wrongfulness of his criminal conduct is hard to believe.  Andrew was an educator who, imposed "severe disciplinary policies . . . towards *students*" who violated DPPS rules.  (Ex. A (emphasis added).)  Yet, ironically, the defendant seemed unwilling to own up to his conduct before this Court.  He even coyly asked "[w]hen we're referring to the victim, who are we speaking of?"  (Tr. at 25.)  The defendant plainly knew who the victim of his crime was.  Such a comment, made to this Court during the day he was supposed to account for his conduct, is deeply troubling.

The defendant has no criminal history, and, on the surface, specific deterrence should play little, if any, role in sentencing.  On the other hand, Andrew's conduct during the plea allocution suggests that the defendant may expect to tip-toe his way around serious consequences for his actions.  There should be no ambiguity on this point.  The defendant committed a shameless crime motivated by the enmity he had for Democracy Prep.  A sentence of incarceration is appropriate.

July 21, 2022
Page 13

        *c.   The Defendant's Arguments in Favor of a Non-Incarceratory Sentence Are Meritless*

As an initial matter, the defense is correct that Andrew had led an admirable life primarily dedicated to public service.  (*See* Def. Subm. at 25 – 26.)  In so doing, he created a network of schools and helped students, teachers, and communities.  This personal history is an appropriate consideration for the Court that should not be overlooked when fashioning a sentence.  However, Andrew's commitment to public service, and in particular his decision to lead a life focused on teaching students, means he knew better than to commit this crime.  Indeed, in an interview describing teaching civic content to kindergartners, Andrew stated the focus for kindergartners is to teach them "about community and our responsibilities to one another." (Ex. D ("Q&A: Seth Andrew - Democracy Prep founder on building active citizens").)[8]  Andrew chose not to live up to the values he espoused to five-year-old children.  Even worse, Andrew's motivation was primarily punitive, and his actions were calculated, and occurred over a period of many months.  Andrew's significant past work in underserved communities does not nullify the severity of his criminal conduct.

Next, the defense contends that the defendant "did not spend any of the transferred funds for personal gain." (Def. Subm. at 19.)  It is correct that Andrew did not use the money he stole to buy a fancy car, but it is wrong to frame the defendant's crime as something that did not benefit him.  As an initial matter, Andrew benefited because he satisfied his ego and harmed Democracy Prep.  (*See* Def. Subm. at 19 ("Ego undoubtedly played a role in Seth's actions").)  But Andrew also used the money he stole for a personal benefit that mattered to him—the success of Democracy Builders, the organization that became his primary focus.  Propping up the Democracy Builders was not some trivial benefit.  As the defendant's submission contends, Andrew "contributed hundreds of thousands of dollars of his own funds in loans and donations to Democracy Builders." (Def. Subm. at 19.)  Thus, using the stolen money for Democracy Builders obviated his need to provide the organization additional loans or otherwise find additional funding. And there was a direct benefit.  $212,000 of stolen funds entered the Democracy Builders operating account the day before Democracy Builders transferred $225,000 to purchase land in Vermont intended to be the center of the Democracy Builders program.  Beyond the quantifiable financial benefits, Andrew's success was intertwined with Democracy Builders' success.  If that organization failed, it would mark a failure for Andrew.  The defendant gained from using DPPS's money to fund Democracy Builders because that organization's success would further his own reputation.[9]

---

[8] This interview is dated May 29, 2019, which indicates it was likely conducted around the time that Andrew stole Democracy Prep's money in March 2019.

[9] Whether "Democracy Builders Fund, was dedicated to helping the same groups of at-risk youth who were the focus of Democracy Prep's mission" is true or not is entirely irrelevant. (Def. Subm. at 25.)  The stolen money belonged to Democracy Prep, even if Democracy Builders had identical goals, which it did not, Andrew had no right to decide that Democracy Prep's money should be spent on Democracy Builders.

July 21, 2022
Page 14


That the defendant has suffered consequences to his professional life is a predictable consequence of the defendant's decision to steal money from a non-profit organization. But those collateral consequences, which are of the defendant's own making, do not obviate the need for a significant sentence of incarceration. If it did, it would have the perverse effect of excusing those who led successful professional lives from the consequences of their criminal acts, while individuals who are of lesser means, and cannot point to professional consequences, will be left with stiff sentences. That Andrew was professionally successful underscores why his criminal conduct was egregious. There was no financial strain on him compelling him to steal. He committed this crime for punitive reasons, and because he could. In any event, that the defendant can count on the support of more than 50 individuals who provided letters of support, even after pleading guilty, cuts against the argument that his professional career is forever broken. (*See* Def. Subm. Exs. A – EEE.) Indeed, the defense highlights that many of Andrew's supporters believe he will continue to work to improve the educational system, and "the best is yet to come." (Def Subm. 29 - 30.)

The defendant's sentencing submission also appears to deflect some of the defendant's actions onto the victim. (*See* Ex. A ("[the defendant's] attempt to shift blame onto his victim are behaviors and excuses he would not have accepted from even our very youngest scholar").) The defense's submission describes the defendant as "immensely frustrated" because DPPS was "forced" to close one of its schools and, in the defendant's "mind, Democracy Prep was in danger of losing focus on the most vulnerable of its students." (Def. Subm. at 17.) Another key concern of Andrew's was his "perceived . . . financial mismanagement at the organization." (Def. Subm. at 18.) Even if this self-serving narrative is true, it does not justify Andrew's theft. If anything, looking at the crime through Andrew's point of view highlights his malevolent motives. Because he was frustrated with "fundamental financial mismanagement" and the resulting "danger" that DPPS would lose focus on "the most vulnerable of its students," Andrew responded by taking $218,000 from the very school he built to serve those students, undoubtably exacerbating the school's financial problems. But that was the point. To do harm. Far from mitigating his actions, viewing the crime through the defendant's mindset, shows why this was a serious criminal offense and significant sentence is warranted.[10]

The defendant also contends that the Stipulated Guidelines Range is ill-suited to "measure [ ] the seriousness of Seth's offense" in part because it is primarily driven by loss amount. (Def. Subm. at 23.) The defendant is wrong. Before deducting for acceptance of responsibility, the applicable offense level is 19, and nearly half of the offense level is a result of Andrew's conduct. Seven points are the base offense level with a two-point enhancement for misrepresentation that

---

[10] As described above, Democracy Prep was harmed by Andrew's conduct but the defense appears to imply that the harm was blunted because the stolen funds "were not used for any ongoing operations of the schools" and were kept in "dormant" accounts. (Def. Subm. at 18-19.) Andrew knew, because he signed the agreement with the NY Board of Regents, that DPPS was contractually obligated to maintain these accounts. Failure to do so was a material breach of the agreement with the Board of Regents and threatened the schools' authorization. Even if the funds were not used for operations, once Andrew stole them, they would need to be replenished with funding from other DPPS sources including potentially operational accounts.

July 21, 2022
Page 15

the defendant was acting on behalf of an educational agency.  That the offense level is further enhanced based on the magnitude of the loss, is a policy decision decided upon by the Sentencing Commission and a logical conclusion that the term of incarceration should reflect the financial harm caused.  *Gall v. United States*, 552 U.S. 38, 46 (2007) (declaring the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").  While the Government believes the Stipulated Guidelines Range appropriately accounts for Andrew's conduct, if anything, the range understates his criminal acts.  The Stipulated Guidelines Range does not consider that Andrew's theft was not an isolated event; rather, it was a series of events that took place for approximately a year.  Indeed, the Stipulated Guidelines Range does not account for Andrew's series of financial transactions which cleaned the stolen funds of their association with DPPS so they could be used by Democracy Builders.  That is, Andrew was engaged in money laundering conduct. Had Andrew been convicted of money laundering the applicable offense level would be 22 and the guidelines range, after deductions for acceptance of responsibility, would be 30 – 37 months.  *See* U.S.S.G. § 2S1.1(a)(2) (setting a base offense level of 8) *and* § 2S1.1(b)(2)(B) (increasing the offense level by two points for a 18 U.S.C. § 1956 conviction).  Accordingly, the Stipulated Guidelines Range is  an accurate measure of Andrew's conduct.

E.   Conclusion

The sentence requested by the defendant of "a period of home confinement" followed by probation is an unjust result, which would send a signal that the successful and well-connected can avoid significant consequences for their criminal actions.  The defendant committed a serious crime that he designed to intentionally harm a non-profit organization.  And he caused harm.  This was a crime of opportunity committed by a man who was successful, educated, and knew better. He betrayed the trust of his students and his community.  Even after taking account of his non-profit work, a significant jail sentence is necessary.

This Court should impose a sentence of incarceration at the low-end of the Stipulated Guidelines Range.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By:  /s/
     Ryan B. Finkel
     Assistant United States Attorney
     (212) 637-6612