

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 7, 2025

**BY ECF**
Hon. John P. Cronan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Andrew*, 22 Cr. 32 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this letter in response to the Court's February 21, 2025 order, Dkt. 55, and in opposition to the Probation Department's request for early termination of the defendant's supervised release.

**I.    Background**

    *a.  Offense Conduct*

    Seth Andrew (the "defendant") founded the first Democracy Prep public school in 2005, becoming its superintendent and thereafter the *de facto* leader over all of Democracy Prep Public Schools ("DPPS"). In October 2012, the defendant announced he was leaving DPPS to begin work promoting another non-profit, Democracy Builders. (PSR ¶ 13.) Years later, the defendant used his previous relationship with DPPS to rob DPPS of more than $200,000.

    The New York State Board of Regents requires that charter schools maintain an escrow account of at least approximately $75,000 that can be accessed only for certain reasons, such as to cover expenses should the school ever dissolve. (PSR ¶ 22.) On March 5, 2009, March 8, 2011, and March 26, 2013, DPPS opened escrow accounts for three schools in its network. (*See* PSR ¶¶ 22 – 26.) The defendant was identified in the opening paperwork for each of those three accounts.

    Under the leadership of former executives, in late 2018 and early 2019, DPPS faced certain financial challenges. During this time, Andrew maintained contact with DPPS's then-CEO and opined how the issues should be resolved. In early 2019, the then-CEO was replaced. Apparently frustrated with decisions made by DPPS, and his inability to exercise control over the organization, Andrew sought to rejoin DPPS. Ultimately, Andrew sent DPPS leadership an email demanding a "$25k/month as salaried employee and basic frugal expenses would be covered . . . . But every single day that goes by, this situation becomes exponentially more difficult and the ability to pull

out of a nosedive becomes harder. So after 24 hours, my monthly salary expectation will go up every day that we're not under a signed contract." (Dkt. 43, Ex. B.) DPPS rejected Andrew's offer.

Days after the rejection, Andrew walked into a particular bank ("Bank-1") in Manhattan, and, without authorization from anyone, closed two of DPPS's escrow accounts and obtained checks totaling approximately $141,000. (PSR ¶¶ 28 – 29.) Andrew then opened accounts at another bank, deposited those checks, and laundered the stolen proceeds to accounts under his control. Approximately six months later, on October 17, 2019, Andrew returned to a Bank-1 branch and, without receiving authorization from anyone, closed out a third DPPS escrow account. (PSR ¶ 38.) This time the defendant collected a check in the amount of $75,481.10. Andrew laundered those funds too. Eventually, the stolen funds were used by another nonprofit Andrew started. Andrew also used the funds to obtain, as a collateral benefit, a discount on a personal mortgage.

### b. District Court Proceedings

Andrew was arrested on April 27, 2021, pursuant to a Complaint, which charged him with wire fraud, money laundering, and making false statements to a bank. On January 14, 2022, Andrew waived his right to an indictment and plead guilty to one count of wire fraud pursuant to a plea agreement, which stipulated to a Guidelines Range of 21 to 27 months. After pleading guilty, the defendant satisfied his restitution obligation to DPPS in the amount of $218,005 and satisfied his forfeiture obligation to the Government in the amount of $22,537.47

At sentencing, the defendant sought "a period of home confinement" followed by probation. The Government requested a sentence at the lower-end of the Stipulated Guidelines Range.

Before imposing sentence, this Court found, *inter alia*, that: (i) "it is a fair inference that the[ multiple financial] transactions were intended, at least in part, to conceal that the funds had any association with the Democracy Prep schools before the money arrived in" accounts under Andrew's control (Dkt. 51, at 40-41); (ii) Andrew's "motive is somewhat troubling . . . . This was not simply an ego-driven act of impulse. This wasn't a spur-of-the-moment act of frustration. There certainly was ego and frustration involved and a lot of arrogance, but it is also a very intentional and deliberate act against Democracy Prep;" (*id*., at 41) (iii) "pilfering of the escrow account for these three Democracy Prep schools could have been disastrous for those schools and their status in New York State;" (*id*., at 43) (iv) "there is still some degree of a need for deterrence in this case and for the sentence to promote respect for the rule of law. If this conduct were truly aberrant, Mr. Andrew could have corrected it by transferring the money back. He didn't—not the next week, not the next month, not even after a year;" (*id*., at 44) (v) "as to more general deterrence, those who might be tempted to abuse a position of trust must realize that criminal activity will not be tolerated and will result in appropriate consequences;" (*id*.) (vi) "Mr. Andrew knew better, and made a very conscious decision to violate the law. There is no excuse for this conduct;" (*id*. at 45) (vii) "there is also no question that Mr. Andrew has done considerable good for much of his life. The government readily acknowledges this." (*id*. at 45.)

Ultimately, the Court imposed a sentence of 366 days, a $5,000 fine, and three years supervised release. (Dkt. 49.)

### c. Andrew's Appeal

On August 11, 2022, Andrew filed a notice of appeal. On May 16, 2023, the Government moved to dismiss Andrew's appeal. On October 31, 2023, the Second Circuit granted the Government's motion to dismiss to the extent Andrew challenges his sentence and his claim that the Government made a belated *Brady* disclosure. The Second Circuit denied the Government's motion to the extent that Andrew challenged his conviction. Specifically, Andrew argued in his *pro se* briefing that his conviction should be vacated in light of the Supreme Court's rejection of the right-to-control theory of wire fraud in *Ciminelli v. United States*. In connection with that argument, Andrew contended that he did not "receive or spend" the money he stole; that Democracy Prep only suffered mere "political 'harm'" or "reputational 'harm'"; and he had the "right to control" the funds in the escrow account because he was still named as a signatory on the account in stark contrast to his allocution before this Court. *See United States v. Andrew*, No. 22-1749, Dkt. 43, at 5-9 (2d Cir. Feb. 10, 2022). On November 19, 2024, the Second Circuit affirmed this Court's verdict and sentence. (Dkt. 54.)

### d. Andrew's Limited Incarceration

Bureau of Prisons information indicates that Andrew reported to FCI Ottsville as scheduled on September 22, 2022, to serve the Court-imposed sentence of 366 days. Approximately three months later, on December 29, 2022, Andrew was released to a halfway house and it was determined that he was suitable to complete his sentence on home confinement as opposed to a BOP-managed facility. BOP records do not list precisely where the defendant's home confinement was served but his residence as of the date of his release was his family residence on Central Park West in Manhattan. Accordingly, it appears the defendant's home confinement was served there. Due to operation of first step act and good time credits, Andrew's home conferment concluded on May 15, 2023.

Andrew's supervised release began May 16, 2023, and is set to expire May 14, 2026. On February 21, 2025, the Probation Department requested to terminate the defendant's supervised release due, in part, to the decision of Andrew's family to move to Iowa.

## II. Discussion

The Court may, after considering certain of the 18 U.S.C. § 3553(a) factors, "terminate a term of supervised release . . . at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). However, courts "do not order early termination of supervised release as a matter of course." *United States v. Stein*, 09 Cr. 377 (RPK), 2020 WL 4059472, at *2 (E.D.N.Y. July 19, 2020). Rather, such relief may "[o]ccasionally" be justified by "new and unforeseen circumstances," such as "exceptionally good behavior by the defendant" that "render[s] a previously imposed term or condition of release either too harsh or inappropriately

tailored to serve the general punishment goals of section 3553(a)." *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997).

In other words, "[a] defendant's faithful compliance with the terms of his supervision does not, by itself, entitle him to modification or termination of his term of supervised release." *United States v. Bouchareb*, 76 F. Supp. 3d 478, 479 (S.D.N.Y. 2014). That is because "full compliance with the terms of supervised release is what is expected . . . and does not warrant early termination." *Id.*; *see also United States v. Gonzales*, No. 94-CR-0134 (JSR), 2015 WL 4940607, at *1 (S.D.N.Y. Aug. 3, 2015) ("[F]ull compliance with the terms of supervised release is what is expected of [the defendant] . . . and does not warrant early termination.") (internal quotation marks omitted); *United States v. Medina*, 17 F. Supp. 2d 245, 247 (S.D.N.Y. 1998) ("While [the defendant's] post-incarceration conduct is apparently unblemished, this alone cannot be sufficient reason to terminate the supervised release since, if it were, the exception would swallow the rule."). Thus, "courts in this circuit have routinely declined to terminate supervised release based solely on compliance with the terms of supervision." *Stein*, 2020 WL 4059472, at *2 (collecting cases); *see also United States v. Rusin*, 105 F. Supp. 3d 291, 292 (S.D.N.Y. 2015) ("Early termination is not warranted where a defendant did nothing more than that which he was required to do by law.").

Early termination of supervised release is not appropriate in this case. Although the defendant has complied with the terms of supervised release, and satisfied his financial obligations, the defendant has done precisely what he is legally obligated to do. The fact that the defendant has thus far—for less than the first two years of his three-year supervision term—complied with his obligations is not by itself a reason to terminate his supervised release. Nor should the defendant's impending move be viewed as a "new and unforeseen circumstance" that would render the sentence that this Court imposed unduly harsh. *Lussier*, 104 F.3d at 36. The Southern District of Iowa's Probation Office is adequately equipped to supervise the defendant if this District is not. At bottom, the Court imposed a term of 366 days incarceration followed by three years of supervision. The defendant served approximately eight months in total—only approximately three months of which was incarceration and four months constituted home confinement apparently at his Central Park West residence.[1] Nothing extraordinary has occurred which warrants early termination here. Indeed, the Court's statements at sentencing that the defendant's conduct was "troubling," and that there is a need for both specific and general deterrence in this case, apply with equal force today.

---

[1] This is the same residence that the defendant purchased with the benefit of a mortgage discount he obtained because, as a result of the DPPS stolen funds, he qualified for a promotional interest rate. (Dkt. 51 at 37.)

### III. Conclusion

For the foregoing reasons, request for early termination of supervise release should be denied.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

By: /s/
Ryan Finkel
Assistant United States Attorney
(212) 637-6612

Cc: USPO Sandra Osman (via email)
Seth Andrew (via the Probation Office)